CARLIE CHRISTENSEN, United States Attorney (#633)
ERIC G. BENSON, Assistant United States Attorney (#10414)
Attorneys for the United States of America
185 South State Street, Suite 300
Salt Lake City, Utah 84111
Telephone: (801) 524-5682

---

IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

---

| | |
|---|---|
| UNITED STATES OF AMERICA, | **FELONY COMPLAINT** |
| Plaintiff, | Magistrate Case No.: |
| vs. | VIO: MAIL FRAUD, 18 U.S.C. § 1341. |
| JEREMY DAVID JOHNSON, and I WORKS, INC. | 11-6273M |
| Defendants. | |

---

Before a United States Magistrate Judge for the District of Utah, appeared the undersigned, who on oath deposes and says:

### COUNT I
### 18 U.S.C. § 1341
### (Mail Fraud)

On or about October 7, 2009, in the Central Division of the District of Utah,

**JEREMY DAVID JOHNSON, and I WORKS, INC.**

defendants herein, for the purpose of executing a scheme and artifice to defraud, and

attempting to do so, knowingly deposited and caused to be deposited with the United States Postal Service, items to be sent and delivered by the carriers, and knowingly caused items to be delivered by the United States Postal Service, according to the direction thereon.

## AFFIDAVIT

I, Jamie Hipwell, being duly sworn, state that this affidavit is based upon the following facts and information:

1. I am a Special Agent with the Internal Revenue Service, Criminal Investigation (IRS-CI). I have been employed with IRS-CI since December, 2005. I am currently assigned to the Salt Lake City, Utah, post of duty for the Las Vegas Field Office. I have received extensive training in financial investigative techniques. My responsibilities include investigations of possible criminal violations of the Internal Revenue Laws (Title 26, United States Code), the Bank Secrecy Act (Title 31, United States Code), Money Laundering Statutes (Titles 31 and 18, United States Code) and violations of other federal statutes. Prior to being a Special Agent with IRSCI, I was employed by the IRS as a Revenue Agent; in that capacity I audited individual and corporate tax returns.

2. I have successfully completed the Criminal Investigator Training Program and the IRS Special Agent Basic Training Program at the Federal Law Enforcement Training Center, which encompassed detailed training in conducting financial investigations and in the use of search warrants in tax related investigations. In 2001, I received a Bachelor's

Degree from Weber State University in accounting.

3. I have participated in several search warrants of businesses and residences. Materials for which I have searched have included tax returns and tax return information, business records, bank records, and other documents evidencing the obtaining, secreting, and/or concealing of assets by individuals or business entities.

### A. Background

1. At all times relevant to this Complaint, Defendant JEREMY JOHNSON was an individual residing in St. George, Utah and was the sole owner, officer, and mastermind of Defendant I WORKS, INC.

2. At all times relevant to this Complaint, Defendant's company, Defendant I WORKS, INC. ("Defendant I WORKS") was a company incorporated in Utah in 2000. Defendant I WORKS' headquarters was located at 249 East Tabernacle Street, Suite 200, in St. George, Utah and it had a satellite office at 100 Wilshire Blvd, Suite 750, Santa Monica, California. Defendant I WORKS was in the business of Internet sales and marketing and did business under a host of names, including but not limited to Acai, Badcustomer.com, Blue Sky Marketing, Bottom Dollar, Business Funding Success, ClickNOffer, Denta-brite, Easy Grant Finder, Fast Gov Grants, Fit Factory, GrantAcademy.com, GrantCreator.com, Grant Professor, Grant Master, Grant Search, Grant Writer, Internet Economy, JRS Media Solutions, Living Lean, Net Pro Marketing, Online Auction Solutions, On Point Media Solutions, Quick Grant Pro, Raven Media,

Rebate Millionaire, SBA, Track it Daily, Websavers, and 501c3.

3. Defendant I WORKS marketed many products, including certain primary, or "core," products. These core products fell primarily, although not exclusively, into three lines: (a) software for securing government grants to pay for personal expenses, and (b) search-engine based money-making schemes, and (c) memberships in programs associated with the other core products. Defendant I WORKS marketed and sold these core products under hundreds of different names, including Cost Smashers, Express Business Funding, Everyday Legal Forms, Fast Funding Solutions, Funding Accelerator, Google Money Profit, Grant Resource Center, Network Agenda, Personal Wealth, and Rebate Millionaire. Defendant I WORKS' products were marketed and sold primarily on the Internet.

4. Defendant I WORKS' core products were sold as part of a Negative Option Continuity Program. A Negative Option Continuity Program is one where a consumer purchases a product and is automatically enrolled in a membership program that results in recurring charges to the consumer's credit card that continue until the consumer cancels the membership.

5. Defendant I WORKS also marketed other products called "forced up-sells." Up-sells are sales of additional products and memberships unrelated to the primary, or core, product being sold. Forced up-sells are up-sells that are automatically sold and charged to consumers' credit cards without their knowledge or consent.

6. Defendant I WORKS also provided many other services to on-line sellers, including marketing the seller's products, processing their credit card and debit card charges for their products through Defendant I WORKS' merchant accounts, responding to inquiries from payment processors and banks, and handling customer services for these on-line sellers. In numerous instances Defendant I WORKS bundled its products as forced up-sells with the client's core product.

7. Defendant I WORKS also used various payment processors to transact product sales via the Internet. These payment processors included, but were not limited to, First Data, ECHO, Global Payment Systems, Litle & Co., Moneris, Payment Tech, Trident, and Vital, as well as several independent sales orginizations ("ISOs"), including but not limited to CardFlex, RDK, Inc., Merchant eSolutions, Pivotal Payments, PowerPay, and Swipe Merchant Solutions. The ISOs acted as sales agents for the payment processors and merchant banks processing product sales on behalf of defendants JEREMY DAVID JOHNSON and I WORKS via the Internet. Defendants JEREMY DAVID JOHNSON and Defendant I WORKS worked with these payment processors and ISOs to obtain numerous merchant bank accounts at various merchant banks, including but not limited to Wells Fargo, N.A., HSBC Bank USA, First Regional Bank, Harris National Association, and Columbus Bank and Trust Company. Defendants JEREMY DAVID JOHNSON and Defendant I WORKS used these accounts with the payment processors and merchant banks to process the credit and debit card charges for Defendant

I WORKS' sale of products via the Internet.

8. Defendants JEREMY DAVID JOHNSON and Defendant I WORKS also operated, through Bottom Dollar, a shell company, i.e. a company without any appreciable assets, the website www.badcustomer.com, which Defendant I WORKS identified as an Internet consumer blacklist to which Defendant I WORKS claimed to refer customers seeking charge backs, also claiming that referral to www.badcustomer.com would result in merchant banks blocking the consumer from making any future purchases on-line.

9. Defendant JEREMY DAVID JOHNSON also created companies, including Elite Debit, that used remotely-created payment orders to debit customers' bank accounts for defendant Defendant I WORKS' product sales.

10. Defendant JEREMY DAVID JOHNSON had signatory authority over numerous accounts at financial institutions containing funds from the sale of Defendant I WORKS products.

11. Defendant I WORKS utilized at least 18 active depository accounts in its own name at six different banks. Since 2006, Defendant I WORKS' sale of core products and up-sells (including forced up-sells) and consumer leads has generated more than $350 million in sales.

**B. The Victims**

12. The victims include hundreds of thousands of consumers who, because of

the fraudulent representations and omissions of the defendants and their co-conspirators, were unaware that when they agreed to a no-risk free trial of a core product and provided billing information for payment of a nominal fee for shipping and handling, such as $1.99 or $2.99, instead they were immediately and automatically enrolled in a plan, without their knowledge or consent, which resulted in charges to their accounts of a one-time fee of as much as $189 and recurring monthly charges of as much as $59.96 per month, or were fraudulently charged for forced up-sells without their knowledge or consent, or some other variation of such fraudulent transactions.

13. The victims also included various merchant banks. Merchant banks are financial institutions that have relationships with merchants, such as Defendant I WORKS, for the purpose of allowing the merchants to make sales and accept customer payments via credit and debit card. Merchant banks are affiliated with credit card networks, such as VISA and Mastercard. Merchants and merchant banks are assisted in their relationship by payment processors. Payment processors help to facilitate sales transactions conducted on the Internet. Merchant bank relationships are initiated via applications submitted to merchant banks by merchants and payment processors.

14. Beginning in about January 2006, and continuing up to and including the date of this Complaint, within the District of Utah and elsewhere, defendants JEREMY DAVID JOHNSON and Defendant I WORKS devised a scheme and artifice to defraud and to obtain money from consumers by means of false and fraudulent pretenses,

representations, and promises in violation of 18 U.S.C. § 1341(mail fraud), as more fully described below, and in execution of the scheme and artifice to defraud consumers and banks, the defendants did the following:

(1) in execution of the scheme and artifice to defraud consumers, the defendants knowingly and unlawfully deposited and caused others to deposit letters, correspondence, and the CD-ROMs associated with the grant writing product and other matter to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341.

## THE SCHEME TO DEFRAUD

### A. False Advertising

15. As a part of the scheme, Defendant I WORKS advertised its core products primarily by means of Internet web sites claiming to offer free CD-ROMs ("CDs") available for the cost of shipping and handling and promising consumers success in using the information on the CDs (a) to obtain "free money" from the government "fast" and "easy" by applying for government grants to pay for personal expenses, such as medical bills, utility bills, home remodeling costs, and home mortgage payments, and (b) to make large amounts of money through Internet search-engine advertising, web-based rebate programs and auctions, and by using newer Internet-based technologies such as Twitter. These advertisements were false and fraudulent in one or more ways, including the following: they (a) falsely described the products, (b) misrepresented the likelihood of success in using the products to obtain the intended results, (c) concealed the true

amounts charged to consumers who ordered the products, (d) misrepresented the urgency of ordering the products, (e) contained testimonials that were fabricated and misleading, and (f) failed to disclose that the products were of little, if any, value.

16. Defendant I WORKS' advertising also failed to disclose, or disclosed in a manner calculated to deceive consumers, that furnishing personally identifiable information on Defendant I WORKS' web site, including credit card information, even if only for the purpose of paying shipping and handling charges, automatically enrolled consumers in Negative Option Continuity Programs and forced up-sells of other products.

17. Defendant I WORKS also advertised its products by means of spam emails containing false and fraudulent representations similar to those published on Internet web sites.

18. Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of false advertising on behalf of Defendant I WORKS, including the false claims and omissions referred to above.

19. The misrepresentations and omissions in Defendant I WORKS' advertising concerned matters that were important to consumers in making a decision whether to order products from Defendant I WORKS.

**B. False Testimonials**

20. As a part of the scheme, many of Defendant I WORKS' advertisements included false testimonials encouraging consumers to claim the benefits of Defendant I

WORKS' products. The testimonials often included statements proclaiming the effectiveness of products offered by Defendant I WORKS, accompanied by a photograph of a person to whom the testimonial was attributed. These testimonials were false and fraudulent in one or more ways, including the following: they (a) were false and wholly fabricated, (b) seriously distorted and exaggerated the truth, (c) were attributed to persons who had not used the products, (d) were attributed to persons who knew nothing about Defendant I WORKS or its products, and (e) falsely represented that the products were endorsed by an expert.

21. As a part of the scheme, defendant JEREMY DAVID JOHNSON, together with other co-conspirators, devised and implemented a scheme to fund a limited number of awards to government grant customers from Defendant I WORKS' own resources. These awards ranged from in amounts ranging from $500.00 to as much as $5,000.00 in order to post testimonials attributed to them on Defendant I WORKS' web sites. In the end, some of the recipients of these awards were Defendant I WORKS' employees' spouses and children. These testimonials falsely claimed that Defendant I WORKS' products could be used successfully to secure government grants for the purpose of paying personal expenses, even though the recipients of these awards had never used the grant product.

22. Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of false testimonials on behalf of

Defendant I WORKS, including those referred to above.

23. The misrepresentations and omissions in Defendant I WORKS' testimonials concerned matters that were important to consumers in making a decision about ordering products from Defendant I WORKS.

C. **Phony Positive Reviews on the Internet**

24. When the marketing practices of the defendants and their co-conspirators caused complaining customers to flood the Internet with negative comments about Defendant I WORKS' products and marketing practices posted on web sites and blogs, the defendants and their co-conspirators sought to combat these unfavorable comments by hiring third parties to create and post on the Internet positive articles and web pages. These positive articles and web pages represented, expressly or by implication, that they were independent reviews reflecting the opinions of unbiased consumers who had successfully used Defendant I WORKS' products to secure government grants to pay personal expenses or to earn substantial income through money-making programs.

25. In fact, the positive articles and web pages about Defendant I WORKS' grant and money-making programs were not independent at all. Rather than reflecting the opinions of unbiased consumers who had successfully used these grant and money-making products, these reviews were, instead, created by defendants and their co-conspirators and agents and any representations that they were independent, fair, accurate, or unbiased were false.

### D. Continuity and Negative Option Program

26. Defendant I WORKS marketed its core products through a continuity and negative option program where consumers ordered a so-called "free" product such as a CD for securing government grants or a CD for making money and disclosed their credit card billing information for the ostensible purpose of paying a nominal fee, such as $1.99 or $2.99, for shipping and handling. As a part of the scheme, however, consumers were then immediately enrolled by Defendant I WORKS in a membership program in which their credit cards were automatically charged with a one-time fee of as much as $189, as well as recurring membership fees of as much as $59.95 per month that continued until the consumer actively canceled membership in the program.

27. Because of the fraudulent advertising on Defendant I WORKS' web sites, which was calculated to deceive consumers and conceal information from them, in most, if not all, cases consumers who ordered free products from Defendant I WORKS were not aware of (a) their enrollment in the membership program, (b) the one-time fee, (c) the recurring monthly membership fees, or (d) the requirement to cancel the membership to avoid the fees. Pursuant to the scheme, consumers became aware of these fraudulent charges only after receiving credit card statements showing the charges.

28. Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of Defendant I WORKS' Negative Option Continuity Program.

29. The misrepresentations and omissions in Defendant I WORKS' Negative Option Continuity Program were matters of importance to consumers in making a decision about ordering products from Defendant I WORKS.

E. **Forced Up-sells**

30. As a part of the scheme, Defendant I WORKS frequently bundled products from its marketing partners with Defendant I WORKS' own core products. Once consumers disclosed their credit card billing information for the purpose of ordering one of Defendant I WORKS' core products, the partners' products were automatically charged to consumers' credit card accounts as forced up-sells.

31. Defendant I WORKS also arranged for its marketing partners to bundle Defendant I WORKS' core products with their own products and, once consumers' credit card billing information was furnished to the marketing partners for purchases of their products, Defendant I WORKS' products were automatically charged to consumers' credit cards as forced up-sells.

32. Defendant I WORKS also frequently used its own core products as forced up-sells, automatically enrolling consumers who ordered one core product in a membership program for another core product.

33. These forced up-sells were charged to consumers' credit cards without their knowledge or consent, or were disclosed in a deceptive manner that was calculated to conceal them from consumers, and consumers became aware of them only after receiving

credit card statements revealing charges for the forced up-sells.

34. Defendant JEREMY DAVID JOHNSON and the other co-conspirators, among others, created or directed the creation of Defendant I WORKS' program of forced up-sells.

35. The misrepresentations and omissions in Defendant I WORKS' forced up-sell program were matters of importance to consumers in making a decision about ordering products from Defendant I WORKS.

### F. Refund and Charge-back Policy

36. As part of the scheme and in order to minimize refunds and charge-backs, defendants and their co-conspirators discouraged consumers from seeking refunds, or charge-backs, of fees fraudulently charged to their credit card accounts. The conspirators generally implemented a three-step process for customers requesting refunds. First, when customers called and complained about unauthorized charges or debits on their statements, demanded cancellation of unauthorized memberships, and demanded refunds of charges, Defendant I WORKS' call center representatives attempted to rebut customers' claims and "resell" the memberships and other products. Second, when complaining customers persisted in their complaints and demands, their calls were forwarded to supervisors who also attempted to rebut their complaints. Third, customers who continued to demand relief were told they would be reported to an Internet consumer blacklist at www.badcustomer.com, which would result in merchants blocking such

customers from making further purchases on-line. Only when customers threatened to complain to the Better Business Bureau or to some law enforcement agency did Defendant I WORKS agree to pay a refund, although not always a full refund.

37. In fact, as part of the scheme to defraud, the defendants and their co-conspirators and agents themselves owned and operated the web site www.badcustomer.com and any threat that Defendant I WORKS' customers who were referred there would be blacklisted and blocked from making further Internet purchases, except perhaps from Defendant I WORKS itself, was false.

### G. Fraud in Merchant Bank Relationships

38. In order to conduct credit and debit card sales transactions on the Internet, a merchant, such as Defendant I WORKS, is required to have an account, or relationship, with a with a merchant bank. Defendant I WORKS had numerous merchant bank accounts.

39. The continuation of Defendant I WORKS' merchant bank relationships depended on limiting charge-backs on Defendant I WORKS' product sales. When Defendant I WORKS' charge-back numbers with a merchant bank became too high, the merchant bank levied fines against Defendant I WORKS and ultimately terminated the relationship. When a merchant relationship was terminated because of Defendant I WORKS' excessive charge-backs, Defendant I WORKS was placed on a blacklist called the Terminated Merchant File, or "TMF." Once Defendant I WORKS was placed in the

TMF, it was much more difficult for Defendant I WORKS or any company of which defendant JEREMY DAVID JOHNSON was a principal to open new merchant account with any bank. As more merchant banks terminated their relationship with Defendant I WORKS, Defendant I WORKS' very survival was threatened.

40. After banks began terminating merchant accounts in the name of Defendant I WORKS and other companies of which defendant JEREMY DAVID JOHNSON was an officer and began levying substantial fines against them because of their excessive charge-backs, as part of the scheme, defendant JEREMY DAVID JOHNSON directed Defendant I WORKS' employees to create numerous new corporations to act as "fronts" for applications for new merchant bank accounts. The establishment of new merchant accounts to replace the terminated ones would allow the defendants and their co-conspirators to continue to process credit and debit card sales of Defendant I WORKS' core products and up-sells and perpetuate the scheme and artifice to defraud.

41. The shell corporations formed to establish fraudulent merchant bank relationships included Blue Streak Processing, Business First, Cold Bay Media, Ebusiness Success, Ecom Success, Money Harvest, Monroe Processing, Net Commerce, Premier Performance, Pro Internet Services, Revive Marketing, Summit Processing, Tranfirst, Tran Voyage, and Unlimited Processing.

42. These new corporations were nothing more than shell companies with no operations that were formed for the fraudulent purpose of establishing new merchant

bank accounts for Defendant I WORKS, while concealing Defendant I WORKS' participation. The named principals of these shell companies were employees of Defendant I WORKS and associates of defendant JEREMY DAVID JOHNSON who acted merely as "straw principals."

## USE OF THE MAILS

For the purpose of executing and attempting to execute the above-described scheme and artifice to defraud, defendant JEREMY DAVID JOHNSON used and caused to be used the U.S. Mails for, among other things, the shipment of various products to consumers, including the specific mailing:

- Parcel containing the "Fast Grants" CD-ROM

- Mailed by U.S. First Class mail on or about October 7, 2009

- U.S. Postage fee for parcel pre-paid in St. George, Utah

- Parcel received by S.J. on or about October 9, 2009

Your Complainant also has received information that defendant JEREMY DAVID JOHNSON has traveled internationally on various occasions during the last couple of months and has a residence in the country of Costa Rica. Defendant JEREMY DAVID JOHNSON has been living off-and-on in Costa Rica and has access to helicopters and other modes of transportation there. Some of his friends and members of his own family have recently relocated to that country. Additionally, defendant JEREMY DAVID JOHNSON has substantial resources in other countries including real estate holdings in

Belize and the Philippines.

Defendant JEREMY DAVID JOHNSON is slated to travel back to Costa Rica from Phoenix, Arizona on June 11, 2011.

Based on the foregoing, your Complainant has probable cause to believe that JEREMY DAVID JOHNSON has committed the crime of Mail Fraud.

DATED this 10th day of June, 2011.

Jamie Hopwell, Special Agent
Internal Revenue Service

SUBSCRIBED AND SWORN TO BEFORE ME this 10th day of June, 2011.

PAUL M. WARNER
United States Magistrate Judge
United States District Court

APPROVED:

CARLIE CHRISTENSEN
United States Attorney

ERIC G. BENSON
Assistant United States Attorney

AO 442 (Rev. 01/09) Arrest Warrant

# UNITED STATES DISTRICT COURT
for the

Utah

| | |
|---|---|
| United States of America<br>v.<br>JEREMY JOHNSON<br>*Defendant* | )<br>)<br>)  Case No.<br>)<br>) |

## ARREST WARRANT

To:     Any authorized law enforcement officer

**YOU ARE COMMANDED** to arrest and bring before a United States magistrate judge without unnecessary delay
*(name of person to be arrested)*   JEREMY JOHNSON
who is accused of an offense or violation based on the following document filed with the court:

☐ Indictment      ☐ Superseding Indictment      ☐ Information      ☐ Superseding Information      ☑ Complaint
☐ Probation Violation Petition      ☐ Supervised Release Violation Petition      ☐ Violation Notice      ☐ Order of the Court

This offense is briefly described as follows:
18 U.S.C. § 1341, Mail Fraud


Date: June 10, 2011
                                                                                     *Issuing officer's signature*

City and state:  Salt Lake City, Utah                          PAUL M. WARNER, United States Magistrate Court Judge
                                                                                     *Printed name and title*

---

**Return**

This warrant was received on *(date)* _____, and the person was arrested on *(date)* _____
at *(city and state)* _____

Date: _____
                                                                                     *Arresting officer's signature*

                                                                                     *Printed name and title*